DA 12-0466

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 343

JAMES EARL and RACHEL E. EARL,

        Plaintiffs, Appellees, & Cross-Appellants,

    v.

PAVEX, CORP., an Arizona corporation
licensed to do business in Montana,

        Defendant, Appellant, & Cross-Appellee.

APPEAL FROM:    District Court of the Sixteenth Judicial District,
In and For the County of Rosebud, Cause No. DV 08-66
Honorable Joe L. Hegel, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Gerry P. Fagan, Brandon JT Hoskins, Moulton Bellingham PC, Billings, Montana

        For Appellees:

            Steven W. Jennings, Crowley Fleck PLLP, Billings, Montana

Submitted on Briefs:  May 15, 2013
Decided:  November 12, 2013

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     James and Rachel Earl commenced this action against Pavex Corporation in the Sixteenth Judicial District Court, Rosebud County. The Earls sought declaratory rulings concerning two overlapping easements—one 100 feet in width, the other 30 feet in width—that burden the Earls' land for the benefit of Pavex's land. The Earls conceded the 30-foot-wide easement but disputed the 100-foot-wide easement. They asserted that the latter easement is unenforceable because it does not appear in the chain of title to the Earls' property. In the alternative, even if the 100-foot-wide easement is valid, the Earls alleged that they are not required to remove structures and cropland that encroach upon the 30-foot-wide and 100-foot-wide easements.

¶2     The District Court concluded that the 100-foot-wide easement does not burden the Earls' property and, thus, granted summary judgment to the Earls on this issue. The court further concluded that the Earls may be required to remove structures and cropland from the easements—the 30-foot-wide easement, as well as the 100-foot-wide easement if this Court found the latter easement valid—to the extent necessary to effectuate the purposes of the easements. The court thus granted summary judgment to Pavex on this issue.

¶3     Pavex now appeals from the District Court's ruling that the 100-foot-wide easement does not burden the Earls' property, and the Earls cross-appeal from the court's ruling that encroachments may need to be removed. We address two issues: (1) whether Pavex's 100-foot-wide easement was extinguished by failure to properly record it, and (2) whether encroachments need to be removed from Pavex's easements. We reverse as to Issue 1, affirm as to Issue 2, and remand for further proceedings as specified below.

## BACKGROUND

¶4    The two parcels of land at issue in this case were previously held by Edward, Mattie, Robert, Mary, Benjamin, and Kathyrn Keim as a single 390.841-acre tract designated "Tract 1" on Certificate of Survey No. 85486, which is shown here:[1]



¶5    There is a 30-foot-wide easement over Tract 1 beginning at Rosebud County Road #S-447 and running in easterly and northerly directions, as shown by the dashed line on the diagram above.  It appears from documents in the record that one of the Keims'

---

[1] The diagrams contained in this Opinion are part of the record in this case, with some labeling added for clarity.

predecessors in interest (Tongue River Farms, LLC) granted this easement in 1999 for purposes of ingress, egress, and utilities to land north and west of Tract 1. As noted, there is no dispute concerning the validity of this easement, although there is a dispute concerning the need for the Earls to remove encroachments from it.

¶6    In 2006, the Keims executed Amended Certificate of Survey No. 85486/99927, which divided Tract 1 into a 275.940-acre parcel designated Tract 1A and a 52.828-acre parcel designated Tract 2A. (It appears the southernmost 62.073 acres of original Tract 1 had already been severed.) Amended Certificate of Survey No. 85486/99927 shows the same 30-foot-wide easement over what is now Tract 2A and Tract 1A.



¶7      The Keims filed Amended Certificate of Survey No. 85486/99927 with the Rosebud County Clerk and Recorder on August 16, 2006. Nine days later, on August 25, the Keims conveyed Tract 1A to Pavex by a warranty deed which referenced Amended Certificate of Survey No. 85486/99927. The Keims retained Tract 2A. In the deed, the Keims granted Pavex a 100-foot-wide easement over Tract 2A, described as follows:

> together with a non-exclusive, perpetual easement, 100 feet in width, running with the land, for ingress and egress, and for the installation, maintenance, repair and replacement of utilities, from the Tongue River Road to the aforesaid Tract 1A of COS 99927 along, over and beneath an existing roadway on the southerly boundary of [Tract 2A] . . . .

¶8      It appears from the foregoing description that the 100-foot-wide easement follows the same course as the existing 30-foot-wide easement. Pavex's owner, Siamak Samsam, filed an affidavit in the present lawsuit stating that he insisted on the 100-foot-wide easement over Tract 2A when he purchased Tract 1A. He explained that the extra width is necessary to enable the passage of farm equipment and semi-trucks and trailers and that the 30-foot-wide easement, in its existing configuration, is insufficient for this purpose.

¶9      The Keims-Pavex warranty deed was filed with the Rosebud County Clerk and Recorder on September 15, 2006. Seven months later, in April 2007, the Keims entered into a contract for deed for the sale of Tract 2A to the Earls. The contract for deed refers to Amended Certificate of Survey No. 85486/99927 but makes no mention of the 100-foot-wide easement granted in the Keims-Pavex warranty deed.

¶10     The Earls assert that when they purchased Tract 2A, they had knowledge of the 30-foot-wide easement but were unaware of the 100-foot-wide easement. The Earls state that they became aware of the latter easement in April 2008 when James Earl stopped a

5

motorist who was using the roadway over Tract 2A in order to reach Tract 1A. When James asked the motorist what he was doing, the motorist (an associate of Pavex) replied that Pavex holds a 100-foot-wide easement over the southern portion of Tract 2A and that the Earls would need to remove their encroachments from this easement.

¶11 Following this encounter, the Earls contacted Pavex's title company and inquired about the alleged easement. The title company sent the Earls a copy of the deed in which the Keims had granted Pavex the 100-foot-wide easement. The Earls then contacted their own title company. They asserted that their title company had "missed" the Keims-Pavex deed in the title search and demanded that the title company "fight to get this easement off our land."

¶12 The instant action was filed on July 1, 2008, seeking to invalidate Pavex's claimed 100-foot-wide easement or, in the alternative, to obtain a ruling that the Earls are not required to remove their structures and cropland from Pavex's easement(s). The parties filed cross-motions for summary judgment on both issues. The proceedings were stayed for approximately 20 months while the parties attempted to settle the dispute; however, when such efforts proved unsuccessful, the District Court proceeded to issue its rulings from which the parties now appeal and cross-appeal. The District Court's reasoning will be discussed below.

**STANDARD OF REVIEW**

¶13 We review a district court's ruling on a motion for summary judgment de novo, applying the criteria set forth in M. R. Civ. P. 56. *Gordon v. Kuzara*, 2012 MT 206, ¶ 13, 366 Mont. 243, 286 P.3d 895. Summary judgment "should be rendered if the pleadings,

the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." M. R. Civ. P. 56(c)(3). At the summary judgment stage, the court does not make findings of fact, weigh the evidence, choose one disputed fact over another, or assess the credibility of witnesses. Rather, the court examines the pleadings, the discovery and disclosure materials on file, and any affidavits to determine whether there is a genuine issue as to any material fact relating to the legal issues raised and, if there is not, whether the moving party is entitled to judgment as a matter of law on the undisputed facts. *Andersen v. Schenk*, 2009 MT 399, ¶ 2, 353 Mont. 424, 220 P.3d 675.

## DISCUSSION

¶14 ***Issue 1. Whether Pavex's 100-foot-wide easement was extinguished by failure to properly record it.***

¶15 As discussed, the Keims held Tract 1A and Tract 2A in common ownership. In August 2006, they sold Tract 1A to Pavex and retained Tract 2A for themselves. In the deed, the Keims granted Pavex an easement 100 feet in width over Tract 2A for the benefit of Tract 1A. There is no dispute that this was an enforceable easement as between the Keims and Pavex.

¶16 The problem arose eight months later when the Keims sold Tract 2A to the Earls, without any mention of Pavex's 100-foot-wide easement in the Keims-Earls deed. This not uncommon situation has been described in a leading treatise as follows:

> A landowner may convey Blackacre and grant therewith an easement, such as a right of way over his adjoining lot, Whiteacre, to which he retains title; or he may agree not to use Whiteacre in a certain way or for certain purposes. In either case, he has created a servitude which is an

7

encumbrance against Whiteacre. Is a subsequent purchaser of the latter, who has no actual notice of the easement or restriction, bound by the record of the deed of Blackacre?[2]

*American Law of Property* vol. 4, § 17.24, 601-02 (Little, Brown & Co. 1952).

¶17 Whether a subsequent purchaser of the servient estate is bound by the servitude depends on the recording statutes and the required scope of the title search. Laws governing the recording of instruments of conveyance are in force in all the states. Joyce Palomar, *Patton and Palomar on Land Titles* vol. 1, § 4, 14 (3d ed., West 2003); *see generally* Title 70, chapter 21, MCA. These laws generally serve three purposes: to secure prompt recordation of all conveyances by according priority of right to the purchaser who is first to record her conveyance; to protect subsequent purchasers against unknown conveyances and agreements regarding the land; and to preserve an accessible history of each title so that anyone needing the information may reliably ascertain in whom the title is vested and any encumbrances against it. Palomar, *Patton and Palomar on Land Titles* § 4, 14; *see also Blazer v. Wall*, 2008 MT 145, ¶ 73, 343 Mont. 173, 183 P.3d 84 (a central depository of instruments affecting title to real property "enables a prospective purchaser to determine what kind of title he or she is obtaining without having to search beyond public records"); *Erler v. Creative Fin. & Invs.*, 2009 MT 36, ¶ 21, 349 Mont. 207, 203 P.3d 744 (the recording system "imparts constructive notice to subsequent purchasers that there exists another interest in the property").

---

[2] There is some disagreement between the Earls and Pavex about whether the Earls had "actual notice" of the 100-foot-wide easement in April 2007 when they executed the contract for deed. As discussed below, such notice (if it existed) would preclude the Earls from disputing the easement's validity. However, we need not consider the issue of actual notice because we conclude, for the reasons which follow, that the Earls had constructive notice of the easement.

¶18 To effectuate these purposes, the recording acts provide that certain instruments are ineffective or void as to certain parties unless the instruments are duly recorded. Palomar, *Patton and Palomar on Land Titles* § 5, 24-25. Of relevance here, when multiple purchasers hold conflicting interests in a given property, the recording acts will accord priority of right based on one of three approaches. Under the "race" recording system, the purchaser who records first has priority of right. Thus, to preserve her rights, an earlier purchaser must record her conveyance before a later purchaser records his conflicting conveyance, and this is true even if the later purchaser has knowledge of the prior conveyance. Palomar, *Patton and Palomar on Land Titles* §§ 6, 7, at 27-30, 33. This has been termed a "race to the courthouse" system of recordation. *Wede v. Niche Mktg. USA, LLC*, 52 So. 3d 60, 63 n. 6 (La. 2010). Under the "notice" recording system, in contrast, a subsequent purchaser with actual notice of a prior unrecorded conveyance cannot claim priority over the prior purchaser. However, a subsequent purchaser *without* actual notice of a prior conveyance has priority over an earlier purchaser who fails to record her conveyance before the later purchase occurs. Palomar, *Patton and Palomar on Land Titles* § 7, 31-34. Lastly, under the "race-notice" recording system, a subsequent purchaser has priority over an earlier purchaser if the subsequent purchaser (1) lacks notice of the prior conveyance *and* (2) records his conveyance before the prior conveyance is recorded. Palomar, *Patton and Palomar on Land Titles* § 8, 35-39. About one-third of the states—including Montana—have a race-notice recording system. *See* Palomar, *Patton and Palomar on Land Titles* § 8, 36-37 & n. 8; §§ 70-20-303, 70-21-304, MCA; *Hastings v. Wise*, 91 Mont. 430, 435-36, 8 P.2d 636, 638-39 (1932).

¶19 The significance of the recording acts in the present case is that the failure to duly record an express easement may result in the easement's termination—which is what the District Court essentially determined had occurred to Pavex's 100-foot-wide easement.

> In a state with a notice recording system, an unrecorded express easement is extinguished when a bona fide purchaser acquires title to the servient estate without notice of the easement. The same result occurs in a jurisdiction [such as Montana] with a race-notice recording statute if the bona fide purchaser without notice also records the deed to the servient estate before the easement is recorded.

Jon W. Bruce & James W. Ely, Jr., *The Law of Easements and Licenses in Land* § 10:32, 10-90 to 10-92 (Thomson Reuters 2013) (footnotes omitted); *accord Restatement (Third) of Property: Servitudes* § 7.14 (2000); Herbert T. Tiffany, *The Law of Real Property* vol. 3, § 828, 397-99 (3d ed. 1939 & Supp. 1998); Richard R. Powell, *Powell on Real Property* vol. 4, § 34.21[2], 34-197 to 34-198 (LexisNexis Mathew Bender 2013). "In either recording system, an easement holder can preserve the easement simply by recording the easement instrument immediately upon receiving it, thereby imparting constructive notice of the servitude to subsequent purchasers of the servient estate." Bruce & Ely, *The Law of Easements and Licenses in Land* § 10:32, 10-92.

¶20 There is no question that the Keims-Pavex deed was recorded in September 2006, seven months before the Earls entered into the contract for deed with the Keims for the purchase of Tract 2A. However, of further significance to this case, it has been held that a prior conveyance is not "of record" unless and until it is recorded in such a way that a subsequent purchaser may find it in a chain-of-title search. *See* Palomar, *Patton and Palomar on Land Titles* § 8, 39-40 (citing *Keybank N.A. v. NBD Bank*, 699 N.E.2d 322

10

(Ind. App. 1st Dist. 1998)). As the court explained in *Keybank,*

> [t]he recording of an instrument in its proper book is fundamental to the scheme of providing constructive notice through the records. . . . A person charged with the duty of searching the records of a particular tract of property is not on notice of any adverse claims which do not appear in the chain of title; because, otherwise, the recording statute would prove a snare, instead of a protection[, to subsequent purchasers]. . . . Constructive notice is provided when a deed or mortgage is properly acknowledged and placed on the record as required by statute. However, an otherwise valid instrument which is not entitled to be recorded, improperly recorded, or recorded out of the chain of title does not operate as constructive notice, although binding upon persons having actual notice.

699 N.E.2d at 327 (citations and paragraph break omitted).

¶21 At this point, it is necessary to briefly explain the indexing system. Traditionally, jurisdictions have used one of two methods of index preparation: tract indices or grantor/grantee name indices. Palomar, *Patton and Palomar on Land Titles* § 67, 223. Montana uses a grantor/grantee indexing system. As each instrument is received by the county clerk, the name of the grantor is placed alphabetically on the appropriate page of the grantor index, followed by the name of the other party to the document, the book and page of the record, description of the property, dates, etc. At the same time, there is entered alphabetically in a separate grantee index the name of the grantee, with identical information about the document. Palomar, *Patton and Palomar on Land Titles* § 67, 225; §§ 7-4-2613, -2617, -2619, -2620, MCA. These alphabetical indices make it possible to run a chain of title, either forward or backward, from any known owner:

> A searcher may begin with the name of the present owner and work backward under the proper letter of the grantee index until finding the name of that party as grantee in a deed for the land involved. The data regarding the deed is copied from the index and the process repeated as to the grantor in that deed, thus finding the earlier deed in which he was grantee, and so

11

on back for a certain number of years or back to the original grant from a sovereignty.  In order to ascertain mortgages and other encumbrances, the grantor indices must then be run forward as to each name for the period that said party owned the premises.  Another method of search is to run the grantor indices, running the name of an early owner until the deed from him is found, then running the name of party to whom he conveyed and so on down to the date of search, noting en route the encumbrance given by the respective owners.

Palomar, *Patton and Palomar on Land Titles* § 67, 225-26 (footnotes omitted).

¶22     The crux of the issue in this case is whether Pavex's 100-foot-wide easement was recorded in such a way that the Earls should have found it in a chain-of-title search. "There are two lines of authority on the question whether a servitude created by a common grantor in the deed to the benefited parcel is in the chain of title of the burdened lot." *Restatement (Third) of Property: Servitudes* § 7.14, Reporter's Note: Chain of Title; *see also* Palomar, *Patton and Palomar on Land Titles* § 72, 240; *American Law of Property* § 17.24, 602; Tiffany, *The Law of Real Property* vol. 5, § 1266, 23-25. According to the Restatement, "[t]he majority view is that the chain of title includes all servitudes created by the common grantor prior to parting with title to the parcel in question." *Restatement (Third) of Property: Servitudes* § 7.14, cmt. b.  Under this approach, a prospective purchaser is on constructive notice not only of conveyances *to* the prior owners of the parcel, but also of conveyances *from* the prior owners of the parcel during each of their respective periods of ownership.  Pavex advocates for this broad chain-of-title concept.  Conversely, "the minority view restricts the required title search to conveyances of the parcel in question." *Restatement (Third) of Property: Servitudes* § 7.14, cmt. b.  The Earls advocate for this narrow chain-of-title concept.

¶23 New York applies the narrow approach; hence, an owner of land is bound by encumbrances (of which he does not have actual notice at the time of his purchase) only if the encumbrances "appear in some deed of record in the conveyance *to* himself or his direct predecessors in title." *Buffalo Acad. of the Sacred Heart v. Boehm Bros., Inc.*, 196 N.E. 42, 45 (N.Y. 1935) (emphasis added); *accord Witter v. Taggart*, 577 N.E.2d 338, 340-42 (N.Y. 1991); *Simone v. Heidelberg*, 877 N.E.2d 1288, 1290 (N.Y. 2007). In explaining the rationale underlying this approach, the *Witter* court reasoned that

> [t]o impute legal notice for failing to search each chain of title or "deed out" from a common grantor would seem to negative the beneficent purposes of the recording acts and would place too great a burden on prospective purchasers. Therefore, purchasers . . . should not be penalized for failing to search every chain of title branching out from a common grantor's roots in order to unearth potential [encumbrances]. They are legally bound to search only within their own tree trunk line and are bound by constructive or inquiry notice only of [encumbrances] which appear in deeds or other instruments of conveyance in that primary stem.

577 N.E.2d at 341 (citation and some internal quotation marks omitted). The court opined that the dominant landowner or the common grantor could safeguard against the encumbrance's extinguishment "by recording in the servient chain the conveyance creating the [encumbrance] so as to impose notice on subsequent purchasers of the servient land." *Witter*, 577 N.E.2d at 341. Other cases adopting a similar view include *Hancock v. Gumm*, 107 S.E. 872, 877 (Ga. 1921), *Glorieux v. Lighthipe*, 96 A. 94, 95-96 (N.J. 1915), and *Spring Lakes, Ltd. v. O.F.M. Co.*, 467 N.E.2d 537, 539-40 (Ohio 1984).

¶24 Pavex cites *Dukes v. Link*, 315 S.W.3d 712 (Ky. App. 2010), in support of the broad chain-of-title concept. The *Dukes* court held that "the recording of the instrument that grants an easement by a common grantor binds a subsequent purchaser of the tract

13

burdened by the easement regardless of whether it is included in the purchaser's deed." 315 S.W.3d at 717. The court reasoned that "to hold otherwise would leave the holders of easements subject to the whim of a common grantor who could defeat that interest by conveying the same interest to multiple grantees by omitting the easement from the deeds." *Dukes*, 315 S.W.3d at 717. In addition, the court noted that a landowner cannot convey a greater right or estate than he actually possesses, and that the recording statutes protect purchasers against adverse claims of which they "could not have been reasonably aware." *Dukes*, 315 S.W.3d at 717. Other cases similarly holding that a purchaser is on notice of recorded encumbrances from a common grantor during the time he held title to the premises in question include *Hamilton v. Smith*, 208 S.W.2d 425, 427 (Ark. 1948), *Szakaly v. Smith*, 544 N.E.2d 490, 492 (Ind. 1989), *Beins v. Oden*, 843 A.2d 147, 151-52 (Md. Spec. App. 2004), *Guillette v. Daly Dry Wall, Inc.*, 325 N.E.2d 572, 574-75 (Mass. 1975), *McQuade v. Wilcox*, 183 N.W. 771, 773-74 (Mich. 1921), *Duxbury-Fox v. Shakhnovich*, 989 A.2d 246, 252-53 (N.H. 2009), *Cullison v. Hotel Seaside, Inc.*, 268 P. 758, 760 (Or. 1928), *Piper v. Mowris*, 351 A.2d 635, 639 (Pa. 1976), and *Moore v. Center*, 204 A.2d 164, 167 (Vt. 1964). "The rule is based generally upon the principle that a grantee is chargeable with notice of everything affecting his title which could be discovered by an examination of the records of the deeds or other muniments of title of his grantor." *Piper*, 351 A.2d at 639 (internal quotation marks omitted).

¶25 We conclude that the broad approach strikes the appropriate balance between the interest of the owner of the dominant property in retaining her easement and the interest of the purchaser of the servient property in ascertaining whether that land is encumbered.

The narrow chain-of-title concept creates an unacceptable risk that an otherwise valid and recorded easement will be extinguished through mere failure to mention the easement in a deed conveying the servient property. This result is contrary to the recording system's purpose of "impart[ing] constructive notice to subsequent purchasers that there exists another interest in the property." *Erler*, ¶ 21. The general rule in Montana is that "[e]very conveyance of real property acknowledged or proved and certified and recorded as prescribed by law, from the time it is filed with the county clerk for record, is constructive notice of the contents thereof to subsequent purchasers and mortgagees." Section 70-21-302(1), MCA; *see also* § 70-21-301, MCA (defining "conveyance" to embrace "every instrument in writing by which any estate or interest in real property is created, aliened, mortgaged, or encumbered or by which the title to real property may be affected, except wills"). Refusing to impute legal notice of recorded encumbrances given by a landowner while he held title to the servient parcel would negate the broad constructive notice contemplated by these statutes.

¶26 Furthermore, we are not persuaded that it would "negative the beneficent purposes of the recording acts" or "place too great a burden on prospective purchasers," *Witter*, 577 N.E.2d at 341, to require that they search for and examine recorded conveyances by prior owners of the premises in question to ascertain whether encumbrances or servitudes were placed on the property. "The practical effect of the [recording] acts is that an intending purchaser of land may, by reference to the record, determine whether his vendor has previously disposed of any interest in the land." Tiffany, *The Law of Real Property* vol. 5, § 1262, 14. The intending purchaser may do the same with respect to

15

preceding owners of the land during their respective periods of ownership. Tiffany, *The Law of Real Property* vol. 5, § 1262, 14-15.

> The searcher beginning his chain of title uses as a starting point the name of the present owner. By following that name back in the grantee index, the examiner will usually find the grantor from whom he acquired title. Then the name of that party is used in tracing back till the name of the previous owner is ascertained, and the process is repeated till one has traced the chain as far back as practical safety requires, or as far as the records are intelligible to the examiner. . . . Having thus made a skeleton chain of title, *it is necessary to run the grantor indices as to each name for the period that each party owned the property*. This should furnish confirmation of the skeleton *and also provide a list of the recorded encumbrances*, junior interests, and clouds. In turn, it may be necessary to "grantor" the names of these donees in order to ascertain assignments and releases.

*American Law of Property* § 18.1, 656-57 n. 3 (emphases added, cross-reference and paragraph breaks omitted). The ability to conduct such searches is made possible by the maintenance of grantor indices and grantee indices in the county clerk offices throughout this State. *See* §§ 7-4-2613, -2617, -2619, -2620, MCA. Indeed, that is a key function of the two indices. Here, had the Earls properly examined the grantor index for the period during which the Keims owned the land now comprising Tract 2A, they would have found the recorded deed from the Keims to Pavex in which the Keims granted Pavex an easement 100 feet in width over Tract 2A. A purchaser cannot ignore such deeds issued by a common grantor, or fail to search for them, on the theory that the deeds are outside the servient estate's "chain of title." To hold otherwise would undermine the broad constructive notice afforded recorded conveyances under the recording statutes.

¶27 At this juncture, it is necessary to address our decision in *Nelson v. Barlow,* 2008 MT 68, 342 Mont. 93, 179 P.3d 529. The Earls rely on *Nelson* in support of the narrow

16

chain-of-title concept, and the District Court found *Nelson* "controlling" in resolving this case. In *Nelson*, the Cedar Hills Partnership owned lots in the Cedar Hills Subdivision, which bordered Flathead Lake. The Partnership sold Tract 1 to Nelson in 1990. In the deed, which was recorded, the Partnership granted Nelson a "roadway easement as shown on Certificate of Survey No. 4377 for access to Lot 8 of Cedar Hills Subdivision." The Partnership still owned Lot 8 at the time. In 1996, the Partnership sold several lots, including Lot 8, to Barlow. Barlow's deed contained no mention of the easement granted in Nelson's deed. A dispute later arose over the parameters of Nelson's easement. Nelson claimed that "access to Lot 8" meant that he was entitled to cross Lot 8 to access Flathead Lake, while Barlow claimed that Nelson had access along Cedar Hills Drive up to the northern boundary of Lot 8, but not across Lot 8. *Nelson*, ¶¶ 3-7, 10-11.

¶28    The case was decided on the pleadings. *Nelson*, ¶ 9. This Court concluded that "access to Lot 8" was susceptible to two reasonable but conflicting meanings and, as such, was ambiguous. *Nelson*, ¶¶ 14-15. The Court further concluded, however, that the easement was unenforceable in any event because Nelson had failed to allege in his complaint that the easement appeared in Barlow's chain of title or that Barlow otherwise had knowledge of the easement. *Nelson*, ¶ 18. In this regard, the Court cited New York precedent for the proposition that, " ' "[i]n the absence of actual notice before or at the time of . . . purchase or of other exceptional circumstances, an owner of land is only bound by restrictions if they appear in some deed of record in the conveyance to [that owner] or [that owner's] direct predecessors in title." ' " *Nelson*, ¶ 16 (brackets and ellipsis in original) (quoting *Puchalski v. Wedemeyer*, 586 N.Y.S.2d 387, 389 (N.Y. App.

17

Div. 3d Dept. 1992), in turn quoting *Witter*, 577 N.E.2d at 340); *accord Waters v. Blagg*, 2008 MT 451, ¶ 7 n. 2, 348 Mont. 48, 202 P.3d 110.

¶29 Based on the foregoing language in *Nelson*, the Earls argue that "chain of title" includes only deeds of record in the conveyance "to" a landowner or that landowner's direct predecessors in title (the narrow chain-of-title concept). Thus, because Pavex's 100-foot-wide easement does not appear in a deed of record "to" the Earls or their direct predecessors in title (the Keims), the Earls assert they are not bound by this easement. The District Court agreed with this reasoning in granting summary judgment to the Earls.

¶30 On appeal, Pavex argues that *Nelson* is distinguishable from the present case and that we should apply the broad chain-of-title approach here. However, we perceive no principled distinction between this case and *Nelson*. In *Nelson* and the present case, the land that would become the dominant parcel and the land that would become the servient parcel were held in common ownership. In both cases, the common grantor sold the dominant parcel and retained the servient parcel. In both cases, the deed for the dominant parcel referred to a certificate of survey that did not give notice of the claimed easement. In both cases, the deed for the dominant parcel contained language granting the claimed easement over the common grantor's retained property. In both cases, the common grantor subsequently sold the retained property without any mention of the previously granted easement. In both cases, the purchaser of the servient parcel apparently had no actual knowledge of the easement. In both cases, had the purchaser searched the record for encumbrances given by the common grantor during the time he owned the servient land, the purchaser would have discovered the claimed easement.

18

¶31 Thus, we are faced with either perpetuating the narrow chain-of-title rule that the Court imported from New York in the *Nelson* case, or overruling *Nelson* in favor of the broad chain-of-title rule. The Court in *Nelson*, and again in *Waters*, gave no reasoning to support its application of the narrow chain-of-title rule. Under the narrow approach, as explained, a prospective purchaser is not required to search the records for servitudes created by her grantor prior to parting with title to the parcel. The purchaser, in other words, is not on constructive notice of recorded encumbrances given by her grantor while he owned the property. She is on constructive notice only of conveyances "to" her grantor, not "from" her grantor. This approach is in direct contradiction of Montana law, which provides that every instrument in writing by which any estate or interest in real property is created, aliened, mortgaged, or encumbered, or by which the title to real property may be affected, "is constructive notice of the contents thereof to subsequent purchasers and mortgagees" from the time it is filed with the county clerk for record. Sections 70-21-301, -302(1), MCA. Having considered the rationales underlying the two chain-of-title concepts and the purposes of the recording statutes, we conclude that the broad chain-of-title rule strikes the appropriate balance between the dominant landowner's interest and the servient purchaser's interest and is consistent with the broad constructive notice that recorded conveyances are afforded under § 70-21-302(1), MCA. For these reasons, *Nelson* and *Waters* are overruled to the limited extent that these cases support the narrow chain-of-title rule.

¶32 In addition to New York precedent, the Court in *Nelson*, ¶ 16, also cited three Montana cases as examples of the narrow chain-of-title rule: *Rigney v. Swingley*, 112

19

Mont. 104, 113 P.2d 344 (1941), *Goeres v. Lindey's, Inc.*, 190 Mont. 172, 619 P.2d 1194 (1980), and *Loomis v. Luraski*, 2001 MT 223, 306 Mont. 478, 36 P.3d 862. Upon closer examination, however, we conclude that these cases are not controlling here.

¶33 First, *Rigney* concerned a mortgage on an automobile. The mortgage had been executed by an individual who was *not* the automobile's owner. This Court, therefore, held that the mortgage was not in the automobile's chain of title. *Rigney*, 112 Mont. at 106-09, 113 P.2d at 346-47. That is entirely distinguishable from the present case and *Nelson*, where the servitude was granted by the undisputed owner of the land in question.

¶34 Second, *Goeres*—which the Earls cite several times in their brief on appeal— involved a covenant that restricted certain subdivision lots to noncommercial use. Although defendant Lindey's title insurer had found the restriction in its examination of the records, *Goeres*, 190 Mont. at 174, 619 P.2d at 1195-96, the plaintiffs nevertheless conceded that the restriction was not part of Lindey's chain of title, *Goeres*, 190 Mont. at 178, 619 P.2d at 1198. The plaintiffs instead sought enforcement of the restriction on equitable grounds. *Goeres*, 190 Mont. at 175-76, 619 P.2d at 1196-97. On the particular facts of the case, however, this Court concluded that "[e]quity . . . requires more if this Court is to restrict the use of land by mere implication." *Goeres*, 190 Mont. at 179, 619 P.2d at 1198. This holding does not mandate a narrow chain-of-title approach.

¶35 Lastly, *Loomis* involved a "stranger to the deed" issue. The Kolbs sold a portion of their land to the Luraskis. In the deed, the Kolbs reserved a 30-foot-wide easement over the Luraskis' parcel, which was depicted on a referenced certificate of survey. The Kolbs included this reservation to provide access to other property, *which the Kolbs did*

20

*not then own*, located directly north of the Kolbs' property. The Kolbs had thought they might purchase the property to the north, but when they realized they were not going to be able to do so, they recorded an amended certificate of survey which did not include the 30-foot-wide easement over the Luraskis' parcel. *Loomis*, ¶¶ 6-15. Later, the Loomises came into ownership of a portion of the northern property and sought to establish an easement over the Luraskis' parcel, for the benefit of the Loomises' land, based on the reservation in the Kolbs-Luraskis deed. *Loomis*, ¶¶ 16, 27. Yet, neither the Loomises nor their predecessors had been parties to that deed, which did not pertain to the Loomises' property and was outside the Loomises' chain of title. *Loomis*, ¶ 28. This Court held, therefore, that the Loomises had the burden to show that the Kolbs intended to reserve an easement for the benefit of a stranger to the deed. *Loomis*, ¶¶ 32-33. And because the Loomises had failed to meet this burden, the Court concluded that they held no easement rights over the Luraskis' parcel. *Loomis*, ¶¶ 34-37. This holding does not support a narrow chain-of-title approach; it simply reaffirms settled law that an easement generally cannot be reserved in favor of a stranger to the deed. *Loomis*, ¶ 31.

¶36 Accordingly, consistent with §§ 70-21-301 and -302(1), MCA, we hold that a prospective purchaser is on constructive notice of recorded servitudes and encumbrances granted by the existing and prior owners of the parcel in question during the respective periods when each owner held title to the parcel. Had the Earls properly searched and examined the grantor index for conveyances by the Keims during their ownership of the land now comprising Tract 2A, the Earls would have discovered Pavex's 100-foot-wide easement. The Earls purchased Tract 2A prior to our decision in *Nelson* and cannot claim

21

reliance on *Nelson* in failing to discover the 100-foot-wide easement.  The Earls, thus, were on constructive notice of the easement, and the easement is enforceable against the Earls.  To the extent that *Nelson v. Barlow* and *Waters v. Blagg* are inconsistent with this conclusion, they are overruled.  Correspondingly, the District Court's grant of summary judgment to the Earls, and denial of summary judgment to Pavex, is reversed as to this issue.

¶37    ***Issue 2.  Whether encroachments need to be removed from Pavex's easements.***

¶38    In August 2006, when the Keims executed the warranty deed conveying Tract 1A to Pavex and granting Pavex a 100-foot-wide easement over Tract 2A, there were several structures located on Tract 2A, including a rental house, a barn, a well house, and animal sheds.  Some of these structures are situated partially within the 30-foot-wide easement.  At certain points, the structures restrict the easement to 19 feet of clearance.  There also is cropland within the 30-foot-wide easement.  Likewise, depending on the precise position of the 100-foot-wide easement, the structures and cropland may encroach upon that easement as well.  The Earls maintain, however, that they are not required to remove the structures and cropland because (1) Pavex took its easements over Tract 2A subject to open and obvious encroachments that existed at the time of sale and (2) "the owners of Tract 2A (the Earls) have an implied easement within Pavex's easement for the purpose of using their structures and cropland."

¶39    The District Court ruled in favor of Pavex on this issue.  The court reasoned that the plain language of the documents creating the easements is controlling.  The court observed that the easements were granted for ingress and egress and for the installation,

22

maintenance, repair, and replacement of utilities. The court noted that there is no language otherwise limiting the dominant estate's use of the easements to the fullest extent. The court further reasoned that had the grantors wished to limit the easements to accommodate structures or cropland, "they could have included such restrictions in the document creating the easement. They did not and the Court is not willing to imply or insert that which was not included by the grantor." Finally, the court rejected the Earls' claim of an implied easement, noting that an owner of land cannot hold an easement on his own land. *See Albert G. Hoyem Trust v. Galt*, 1998 MT 300, ¶ 22, 292 Mont. 56, 968 P.2d 1135. Thus, the District Court concluded that the encroachments would need to be removed to the extent necessary to effectuate the purposes of Pavex's easements.

¶40 On appeal, the Earls contend that the District Court erred because Pavex took its easements subject to the encroachments and because the Earls hold an implied easement within Pavex's easements. Pavex, conversely, argues that the District Court's decision is correct because any obstructions which interfere with an easement must be removed. Notably, the parties' citations in support of these arguments are, for the most part, not on point. Pavex cites various authorities—such as *Musselshell Ranch Co. v. Seidel-Joukova*, 2011 MT 217, ¶ 26, 362 Mont. 1, 261 P.3d 570—for the proposition that the owner of a servient estate may not erect or place physical obstructions within the easement. Yet, the Earls did not erect or place the physical obstructions at issue in Pavex's easements; the obstructions were already there at the time Tract 2A became burdened with the easements benefitting Tract 1A. Likewise, the Earls cite various authorities concerning easements implied from existing use, *see Yellowstone River, LLC v. Meriwether Land Fund I, LLC*,

23

2011 MT 263, ¶ 30, 362 Mont. 273, 264 P.3d 1065 (explaining such easements), and easements which occupy the same physical location. Yet, with one exception discussed below, none of these authorities contemplate an easement on the servient property, for the benefit of the servient property, consisting of a permanent physical obstruction within the dimensions of the easement expressly granted to the dominant property.

¶41 The one case cited by the Earls that arguably is analogous to the present case is *Newton v. N.Y., New Haven & Hartford R.R. Co.*, 44 A. 813 (Conn. 1899). There, the court recognized that a landowner whose property abuts a highway owns the soil to the center of the highway in fee. As such, the landowner has not only the rights that all others of the community have to travel on the highway, but also certain privileges that are not common to the public generally, such as the right to construct a sidewalk, set hitching posts, and place stepping stones within the right-of-way as it passes in front of the landowner's property. The court characterized this as "an easement upon an easement." *Newton*, 44 A. at 815-16. Even so, however, the court noted that any such obstructions must not interfere with the highway or render it unfit for its purpose (public travel). *Newton*, 44 A. at 815. We conclude that the same principle is controlling here.

¶42 Absent an express provision in a grant or reservation, "[t]he owner of the servient estate may utilize the easement area in any manner and for any purpose that does not unreasonably interfere with the rights of the easement holder." Bruce & Ely, *The Law of Easements and Licenses in Land* § 8:20, 8-63 to 8-65; *accord Sampson v. Grooms*, 230 Mont. 190, 196-97, 748 P.2d 960, 964 (1988); *Strahan v. Bush*, 237 Mont. 265, 268-69, 773 P.2d 718, 721 (1989); *Gabriel v. Wood*, 261 Mont. 170, 177, 862 P.2d 42, 46 (1993);

*Mason v. Garrison*, 2000 MT 78, ¶ 49, 299 Mont. 142, 998 P.2d 531.  In the present case, Tongue River Farms granted an easement 30 feet in width over land now comprising Tract 2A.  The Keims granted an easement 100 feet in width over that same land.  The use of these easements is expressly limited to ingress, egress, and utilities, but there is no express reservation of a right by the servient landowners (Tongue River Farms and the Keims, and now the Earls) to maintain physical obstructions within the easements, and the Earls have shown neither a legal nor a factual basis for implying such a reservation. Indeed, it is implausible that Tongue River Farms and the Keims, on one hand, granted easements for ingress, egress, and utilities but, on the other hand, intended obstructions which unreasonably interfere with the use of these easements to remain in place.

¶43    Unreasonable interference with an easement holder's use of the servient estate is a form of trespass and constitutes an infringement upon a valuable property right.  *See* Bruce & Ely, *The Law of Easements and Licenses in Land* §§ 8:21, 8:32, 8-70, 8-91. Consequently, an easement holder is entitled to equitable relief against a servient owner's unlawful interference with the easement holder's enjoyment of the servitude, particularly when the obstruction is of a permanent character.  Bruce & Ely, *The Law of Easements and Licenses in Land* § 8:32, 8-91 to 8-92; *see e.g. Strahan*, 237 Mont. at 269, 773 P.2d at 721; *Mason*, ¶¶ 46-49.  We therefore agree with the District Court that the structures and cropland must be removed from the two easements to the extent these encroachments constitute unreasonable interference with Pavex's easement rights.  This is a question of fact that will need to be determined on remand.  *See Musselshell Ranch*, ¶ 19 (whether interference is reasonable depends on the factual circumstances of the case).

¶44     We emphasize that the determination whether the encroachments must be removed from the easement requires a balancing of the parties' interests, with reasonableness being the controlling standard. *Mattson v. Mont. Power Co.*, 2009 MT 286, ¶ 52, 352 Mont. 212, 215 P.3d 675 ("[W]e presume that the parties intended a fair balance of their interests."); *Musselshell Ranch*, ¶ 19 ("The balancing of rights . . . incorporates a standard of reasonableness."). Unless otherwise stated in the terms of the servitude, the parties to an express easement are deemed to have contemplated both (1) that the easement holder may do whatever is reasonably convenient or necessary in order to fully enjoy the purposes for which the easement was granted, though he may not cause unreasonable damage to the servient estate or interfere unreasonably with its enjoyment, and (2) that the servient owner may utilize the servient estate, including the easement area, in any manner and for any purpose that does not unreasonably interfere with the easement holder's enjoyment of the servitude. *Mattson*, ¶¶ 44, 52; *Flynn v. Siren*, 219 Mont. 359, 361, 711 P.2d 1371, 1372 (1986); Bruce & Ely, *The Law of Easements and Licenses in Land* §§ 8:3, 8:20, 8-13, 8-65; *Restatement (Third) of Property: Servitudes* §§ 4.9, 4.10. We have recognized the necessity of balancing these interests in various cases. *See e.g. Sampson*, 230 Mont. at 197, 748 P.2d at 964 ("The subject easement must be used only for purposes that do not unreasonably burden the servient tenement and which do not interfere with the use and right reserved to the dominant tenement."); *Gabriel*, 261 Mont. at 177, 862 P.2d at 46 ("[A] gate may be constructed across the easement if it is necessary for the reasonable use of the servient estate and does not interfere with reasonable use of the right-of-way."). Again, what constitutes reasonable use and

26

unreasonable interference is a question of fact, and uniform rules are difficult to formulate. Bruce & Ely, *The Law of Easements and Licenses in Land* §§ 8:3, 8:21, 8-13 to 8-14, 8-70. "Some permanent encroachments may not justify a finding of unreasonable interference. The particular facts of a situation are always controlling, and what is reasonable or unreasonable is often a close call." *Musselshell Ranch*, ¶ 27.

¶45 As a final matter, the Keims-Pavex deed describes the 100-foot-wide easement as located "along, over and beneath" the 30-foot-wide easement. It thus is clear that the 100-foot-wide easement generally follows the same course as the 30-foot-wide easement. This does not necessarily mean that the centerlines of the two easements line up over the entire length of Tract 2A, however. Indeed, it appears from the depiction on Amended Certificate of Survey No. 85486/99927 that the 30-foot-wide easement, at certain points, runs along Tract 2A's outer boundaries, which may cause the 100-foot-wide easement to encroach on land outside Tract 2A if the centerlines of the two easements were lined up.

¶46 Therefore, it will be necessary for the District Court on remand to determine the precise location of the 100-foot-wide easement relative to the 30-foot-wide easement. Various factors may be relevant to this analysis, including the purposes of the easement, the geographic relationship of the properties, the uses of the dominant and servient estates, the benefit to the easement holder compared to the burden on the servient estate owner, and any admissions of the parties. *See* Bruce & Ely, *The Law of Easements and Licenses in Land* § 7:6, 7-13 to 7-17; *Broadwater Dev., LLC v. Nelson*, 2009 MT 317, ¶ 22, 352 Mont. 401, 219 P.3d 492 ("For purposes of interpreting a writing granting an interest in real property, evidence of the surrounding circumstances, including the

situation of the property and the context of the parties' agreement, may be shown so that the judge is placed in the position of those whose language the judge is to interpret.").

## CONCLUSION

¶47 As to Issue 1, the Earls had constructive notice of the 100-foot-wide easement over Tract 2A for the benefit of Tract 1A, and the easement is thus enforceable against the Earls. Pavex is entitled to summary judgment on this issue, and the District Court's contrary conclusion is accordingly reversed. As to Issue 2, the structures and cropland that encroach upon the 30-foot-wide easement and/or 100-foot-wide easement must be removed to the extent they constitute unreasonable interference with Pavex's easement rights. The District Court's grant of summary judgment to Pavex on this legal question is accordingly affirmed.

¶48 However, whether the structures and cropland actually interfere unreasonably with the two easements is a question of fact that will need to be determined on remand. In conjunction with this determination, the District Court will also need to determine the precise location of the 100-foot-wide easement relative to the 30-foot-wide easement based on the factors set out above and any other circumstances the court deems relevant.

¶49 Affirmed in part, reversed in part, and remanded for further proceedings.

/S/ LAURIE McKINNON

We Concur:

/S/ BRIAN MORRIS
/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ MIKE McGRATH
/S/ JIM RICE