DA 20-0517

FILED

08/17/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0517

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2021 MT 204

JRN HOLDINGS, LLC, A LIMITED LIABILITY COMPANY,

Plaintiff and Appellant,

v.

DEARBORN MEADOWS LAND OWNERS ASSOCIATION, INC.,
A Montana Nonprofit Corporation, Its President, JIM BECK,
Its Vice President, PAT RACICOT, Its Representative of Record,
ART POWELL, AND DOES 1-100, Consisting of all others who
claim a non-consensual right of access across Plaintiff's real property,

Defendants and Appellees.

| | |
|---|---|
| APPEAL FROM: | District Court of the Eighth Judicial District,<br>In and For the County of Cascade, Cause No. ADV-17-0113<br>Honorable Gregory G. Pinski, Presiding Judge |

COUNSEL OF RECORD:

For Appellant:

David B. Gallik, Gallik Law Office, PLLC, Helena, Montana

For Appellee:

Frederick F. Sherwood, Anne E. Sherwood, Morrison, Sherwood, Wilson & Deola, PLLP, Helena, Montana

Submitted on Briefs: May 12, 2021

Decided: August 17, 2021

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     JRN Holdings, LLC ("JRN"), appeals the Eighth Judicial District Court's ruling that the Dearborn Meadows Land Owners Association, Inc. ("DMLOA"), established on behalf of its members an implied easement by preexisting use and a prescriptive easement over Powerline Road across JRN's property. JRN additionally appeals the District Court's order awarding the DMLOA attorney fees. We affirm in part and reverse in part. We address these restated issues:

1. *Whether the District Court erred in concluding that both implied and prescriptive easements existed for use by DMLOA members and the general public.*

2. *Whether the District Court abused its discretion by granting the DMLOA attorney fees under § 27-8-313, MCA.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2     This case involves a dispute regarding the use of Powerline Road ("the Road"), an unpaved road in the Dearborn Meadows area within both Cascade and Lewis and Clark Counties. The Road intersects with Dearborn River Road—the main road providing access to the Dearborn Meadows area—which leads to the interstate highway. The Road traverses JRN's property in Cascade County to where it meets the east bank of the Dearborn River ("the River"), where a ford[1] connects it to the west bank of the river; there, it continues on its path through the Dearborn Meadows area of Lewis and Clark County.

---

[1] A ford is "a tract of shallow water," where a person may cross by wading (or presumably driving). *Ford*, *Oxford English Dictionary* 1050 (Compact ed. 1971).



*Figure 1: Portion of 1961 USGS Map of Cascade and Lewis & Clark Counties; Annotated by the DMLOA and included in its Motion and Brief for Summary Judgment*



*Figure 2: 2017 Montana Cadastral image identifying* JRN's *Property; Annotations added by the DMLOA and included in its Motion and Brief for Summary Judgment*

¶3 *Parties to the Case*

¶4 The DMLOA was incorporated in 1977 for "[t]he primary and exclusive purposes . . . [of] represent[ing] the interests of the property owners of that land development known as Dearborn Meadows and Upper Sawmill," including "maintain[ing] a viable road system through Dearborn Meadows and Upper Sawmill" and "interact[ing] with any individuals, groups, agencies, or corporations on behalf of the jointly-defined concerns and goals of the property owners[.]" DMLOA "[m]embership is open to

4

landowners of Dearborn Meadows and surrounding areas who own land in recreation developments."

¶5　　JRN is a limited liability company whose members are part of the Sechena family—John Sechena, Ruth Sechena, and Nick Sechena. Sechena family members historically and currently own other property in the Dearborn Meadows area. John, Ruth, and Nick all live and work in Seattle, but they often spend their holidays in the Dearborn Meadows area. John has a dental practice in Seattle which Ruth manages; Ruth previously worked as a physician. JRN uses the property at issue in this suit to generate income from a vacation rental, though Ruth testified that she and John purchased the property with the intent to eventually retire in the area.

¶6　　*History of Dearborn Meadows*

¶7　　Prior to 1971, Nina and Fred Dear owned a large area of property on both the Cascade and Lewis and Clark County sides of the lower Dearborn River. The Dears' property encompassed the Dearborn Meadows area, which was undeveloped at the time, including the property now owned by JRN. The Dears subdivided and then sold the Dearborn Meadows area to LDS, Inc., ("LDS") a developer that further subdivided the land and sold the parcels to many different owners over at least the next couple of decades. In 1971, LDS sold the property now owned by JRN to its predecessors in interest.[2] Neither the deed from the Dears to LDS nor the deed from LDS to JRN's predecessors in interest expressly reserved an easement across the Road in Dearborn Meadows for access to the

_____

[2] JRN disputed below and continues to dispute that LDS ever owned its property, but it fails to clearly articulate the relevance of this dispute to its argument on appeal.

5

remainder of the property. JRN's property passed through two more ownerships before JRN purchased it in 2010. In 1981, LDS sold the DMLOA two parcels adjacent to the east bank of the river, which are now private parks designated for DMLOA members' use.

¶8 The Road has existed since at least the 1960s. A power company originally built the Road to access its overhead power lines, and it obtained an express easement over the properties the Road traversed. The Road appears on a 1961 United States Geological Survey ("USGS") map (depicted above) and on aerial photographs taken since the 1960s. It is apparent on the ground and is marked by its own "Powerline Road" sign. The Road exists on both sides of the river. Although the location of the fords that cross the river has changed over time, the location of the Road through JRN's property has remained the same. The Road historically has not been blocked with a gate or other barrier, but previous landowners have posted "no trespassing" signs. The parties dispute the extent to which the DMLOA has maintained the Road—DMLOA witnesses testified that it has maintained the full length of the Road; JRN argues that the Road "was deeply rutted and dangerous to drive" at the time it purchased the subject property in 2010, and that since this time it has handled the Road's maintenance over its property on the Cascade County side of the river. Since Dearborn Meadows was developed, many nearby landowners used Powerline Road to access the river for recreation and to reach the properties on the Lewis and Clark County side of the river.

¶9 In the early 1970s, LDS constructed a ford about two hundred yards upstream from the Road ("upstream ford"). The river flooded in 1974 or 1975, washing out and rendering unusable the ford adjacent to the Road ("downstream ford") until it was reconstructed in

6

1985. DMLOA landowners during this time thus used the upstream ford to access the properties on the Lewis and Clark County side of the river; for example, Dale Rugwell—who owns land directly across from the downstream ford—testified that he would drive down the Road until he reached the river and then drive upstream along the east bank of the river until he reached the upstream ford. Sometime after 1996, nearby landowners allegedly blocked the upstream ford so that it was no longer usable.

¶10   *Events Relevant to this Case*

¶11   In 2012, JRN provided to the DMLOA landowners who access their property via the Road notice of its intent to erect a gate across the Road. It explained in this notice letter the purpose of its intended action:

> **THE PROBLEMS WE ALL FACE:**
> **Unauthorized use of our properties** – Some Dearborn Community members, as well as outsiders, have used Powerline Road to access the Dearborn River, your properties and ours. The result has been property vandalism; forest fires set on the south side of the river by people who had no right to be there; garbage and litter by the roadside; 4-wheelers and hunters using land without permission; and unauthorized wood cutting. Some campers believe it is their right to use Powerline Road as an access to camp on our property and have threatened and intimidated our family and friends. Some of you have recommended locking the gate and we agree it will help solve many of our mutual problems.
>
> **Degradation of Powerline Road** – Unauthorized traffic has degraded Powerline Road significantly. We have provided gravel to improve its safety and accessibility especially when wet. Decreasing traffic will slow the degradation process and make the road safer for all of us. There may be times that road repair is needed and we hope that we can collaboratively work on this as neighbors because the [DMLOA] has limited resources.
>
> **Poor Condition of All Dearborn Community Roads** – We believe that preventing unauthorized Dearborn River access may encourage Dearborn Landowners to pay their [DMLOA] dues especially if Community Park

usage is made contingent upon payment of dues. This additional revenue will help maintain all our roads.

JRN's notice letter advised the landowners to submit a request for a key or combination to a lock it would be placing on the gate. It stated that "[i]n the process of doing this we are sending letters to landowners who may use Powerline Road as it traverses our property to get to their property on the south and west side of the Dearborn River . . . per the recommendation of our attorney." The attached "Lock Combination/Key Form" to be filled out by the landowners stated: "I would like to receive the lock combination/key to that gait [sic] for the sole purpose of gaining access to my property on the south and west side of the Dearborn River"; "Use of this private road and/or adjacent property is prohibited for any other reason, including gaining access from our property or the road to the Dearborn River for fishing, floating, swimming, hiking, etc." JRN alleges that it "cleared [its plan to erect and lock the gate] with the fire department, law enforcement, [the] power company, and sought and received a legal opinion that nobody had an easement across its property at Powerline Road."

¶12 JRN sent a second letter to the landowners in November 2012 indicating that it was "proceed[ing] slowly to ensure that everyone whose sole property access is via this gate has been identified and that they have received notification of our intent to close and lock the gate." It also stated that it was "confident" it had notified all such landowners and that those who had responded—all but five landowners—supported its plan. It stated that it had closed the gate but would not yet lock it. Several landowners responded to JRN's letter

8

and received the key/combination to the lock. JRN then locked the gate in December 2012. It received no objections regarding the locked gate at this time.

¶13 In 2013, JRN's gate was torn down three times. JRN eventually filed suit against two neighbors it alleged were responsible for these actions. The lawsuit was settled and dismissed in May 2016. JRN by letter promptly notified the DMLOA of the settlement and said:

> [t]he gate previously erected by the Sechena's [sic], near the river on their property, will go back up and shall remain locked. Those who own property on the west side of the Dearborn shall be given a key and the combination to the gate and have permission to cross the Sechena's property to access their property at that point. There are no other easements across the Sechena's property.

The DMLOA called a special meeting in September 2016 in response to JRN's notice. At this meeting DMLOA members discussed their concerns about JRN's gate blocking access to the Road. Based on the members' vote, the DMLOA sent a letter to JRN demanding that it remove the gate, posts, and signs within thirty days or else the DMLOA would hire a contractor to do so and would bill JRN for the associated costs.

¶14 In February 2017 JRN filed suit against the DMLOA and its officers, seeking injunctive and declaratory relief that it had a right to place a locked gate across the Road and that the DMLOA's officers and members had no right to enter its property. JRN also requested supplemental relief, including attorney fees, under the Uniform Declaratory Judgments Act's ("UDJA") supplemental relief statute—§ 27-8-313, MCA.[3] The DMLOA

---

[3] Section 27-8-313, MCA, states:

denied JRN's claims and counterclaimed that its members had an implied easement by preexisting use and an easement by prescription over the Road to access the properties on the west side of the river and to access the river for recreational purposes. The DMLOA also requested "costs and attorneys' fees, as allowed by law[.]" The parties stipulated that during the litigation the gate would remain "dummy locked" but that DMLOA officers and members would not use the road.

¶15 The parties filed cross-motions for summary judgment in late 2017, which the District Court denied in a January 2018 Memorandum and Order. Among other things, the court discussed the three elements for an implied easement by preexisting use. It determined that the DMLOA had presented sufficient evidence to establish the first element—common ownership—and part of the second element—apparent and continuous use at the time of severance—but that neither party had presented sufficient evidence of reasonable necessity or the intent of the parties to the deed at the time of severance. It thus concluded there remained material facts in dispute that prevented it from making a determination for that claim.

¶16 The District Court held a bench trial in February 2019 at which several landowners testified. The court issued its findings of fact, conclusions of law, order, permanent injunction, and judgment in September 2019, denying relief to JRN and concluding that

> Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper. The application therefor shall be by petition to a court having jurisdiction to grant the relief. If the application be deemed sufficient, the court shall, on reasonable notice, require any adverse party whose rights have been adjudicated by a declaratory judgment or decree to show cause why further relief should not be granted forthwith.

the DMLOA had established easements by prescription and by preexisting use across the Road for its members' as well as the general public's residential and recreational uses. It enjoined JRN from blocking or otherwise interfering with access to the Road. The court additionally allowed the DMLOA to petition the court for attorney fees under § 27-8-313, MCA, which it did. After briefing and an evidentiary hearing, in September 2020 the court issued two orders awarding the DMLOA $96,650.18 in attorney fees and costs.

**STANDARDS OF REVIEW**

¶17 We review a district court's legal conclusions de novo for correctness. *Davis v. Westphal*, 2017 MT 276, ¶ 10, 389 Mont. 251, 405 P.3d 73 (citation omitted); *Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 28, 360 Mont. 207, 255 P.3d 80 (citations omitted) (identifying the question of standing as a question of law that should be reviewed de novo). "We review the findings of a district court sitting without a jury to determine if the court's findings were clearly erroneous." *Ray v. Nansel*, 2002 MT 191, ¶ 19, 311 Mont. 135, 53 P.3d 870 (citing M. R. Civ. P. 52(a)). A finding is clearly erroneous "if substantial credible evidence does not support [it], if the trial court has misapprehended the effect of the evidence[,] or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been committed." *Ray*, ¶ 19 (citation omitted).

¶18 "This Court reviews a district court's decisions on motions for summary judgment de novo." *Frame v. Huber*, 2010 MT 71, ¶ 7, 355 Mont. 515, 231 P.3d 589 (citation omitted). We review for correctness a court's conclusion regarding the existence of legal

11

authority to award attorney fees. *Abbey/Land, LLC v. Glacier Constr. Partners, LLC*, 2019 MT 19, ¶ 62, 394 Mont. 135, 433 P.3d 1230 (citation omitted). We review a court's order granting attorney fees for an abuse of discretion. *Hughes v. Ahlgren*, 2011 MT 189, ¶ 10, 361 Mont. 319, 258 P.3d 439 (citation omitted).

## DISCUSSION

¶19    *1. Whether the District Court erred in concluding that both implied and prescriptive easements existed for use by DMLOA members and the general public.*

¶20    *A.  Standing*

¶21    We initially address JRN's arguments that the DMLOA does not have standing to pursue its claims. JRN appears to first argue that the DMLOA cannot maintain an action for an implied or prescriptive easement on behalf of its members. It cites § 70-17-109, MCA, for this proposition, which states that "[t]he owner of any estate in a dominant tenement or the occupant of such tenement may maintain an action for the enforcement of an easement attached thereto." JRN apparently contends that, as in *Beach Lateral Water Users Ass'n v. Harrison*, 130 P.3d 1138 (Idaho 2006), the DMLOA may not maintain associational standing for a claim of implied easement by preexisting use when § 70-17-109, MCA, requires participation of each individual landowner seeking an interest in the easement. JRN additionally argues that the DMLOA cannot assert an action on behalf of the general public that seeks to use the Road for recreational purposes. It notes that the DMLOA did not assert such an argument. It thus contends the District Court erred by concluding that either type of easement could extend to the community for recreational purposes.

12

¶22 Associational standing allows an organization to represent and protect its members' rights. *Heffernan*, ¶ 42. This type of standing is an exception to the general rule that a litigant may not raise a third party's rights. *Heffernan*, ¶¶ 42, 44 (citation omitted) (under the doctrine of associational standing, "the association and its members are in every practical sense identical" (internal quotation marks omitted)). An organization may pursue a legal claim on behalf of its members when: (1) at least one member has standing to pursue such a claim in her or his own right; (2) the organization by pursuing the claim is protecting interests germane to its purpose; and (3) neither the claim asserted, nor the relief requested, requires individual participation of each injured party. *Heffernan*, ¶ 43 (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441 (1977); other citation omitted).

¶23 The District Court correctly held that the DMLOA's claims satisfy the *Hunt* test for associational standing. First, all DMLOA members would have standing to bring a claim seeking declaratory or injunctive relief pursuant to an implied or prescriptive easement because they all are affected by JRN's gate. Second, the DMLOA, by defending against JRN's suit and pursuing its easement claims, is acting on its corporate purposes as defined in its Articles of Incorporation of "maintain[ing] a viable road system" and "interact[ing] with any individuals, groups, agencies, or corporations on behalf of the jointly-defined concerns and goals of the property owners[.]" *See Heffernan*, ¶ 43 (citing *Hunt*, 432 U.S. at 343, 97 S. Ct. at 2441).

¶24 Finally, all DMLOA members need not participate in this suit. We recognize the applicability of the principles discussed in *Beach Lateral Water Users Ass'n* to an analysis

13

of the third *Hunt* factor. The Idaho court in that case explained that "[w]hen an association seeks some form of prospective relief, such as a declaration or an injunction, its benefits will likely be shared by the association's members without any need for individualized findings of injury that would require the direct participation of its members as named parties." *Beach Lateral Water Users Ass'n*, 130 P.3d at 1142 (citing *Hunt*, 432 U.S. at 343, 97 S. Ct. at 2441). It thus concluded that though the association's claims for *injunctive relief* with respect to an implied easement were actionable, the association could not maintain associational standing on behalf of itself to *quiet title* in any such easement where it "d[id] not own any of the dominant estates that would be served by the ditch easement in dispute." *Beach Lateral Water Users Ass'n*, 130 P.3d at 1142; *see also Meadow Lake Estates Homeowners Ass'n v. Shoemaker*, 2008 MT 41, 341 Mont. 345, 178 P.3d 81 (allowing a homeowner's association to maintain an action for injunctive relief on behalf of its members to enforce an easement). Because the DMLOA sought relief in the form of declaratory and injunctive relief, rather than to quiet title in its own name or in the names of its members, the District Court correctly held that it satisfied the third requirement of the *Hunt* test. *Heffernan*, ¶ 43 (citing *Hunt*, 432 U.S. at 343, 97 S. Ct. at 2441).

¶25 The District Court thus properly concluded that the DMLOA has associational standing to pursue its easement claims on behalf of its members. We agree with JRN, however, that the DMLOA did not assert its claim on behalf of the general public, nor does it defend against this argument on appeal. The DMLOA does not have standing to bring such an action on behalf of the general public, nor did it attempt to do so. We thus reverse any finding of easements by preexisting use or prescription for the general public's use.

14

¶26　*B. Implied Easement by Preexisting Use*

¶27　"An easement may be created by an instrument in writing, by operation of law, or by prescription." *Yellowstone River, LLC v. Meriwether Land Fund I, LLC*, 2011 MT 263, ¶ 25, 362 Mont. 273, 264 P.3d 1065 (citations omitted). Implied easements are "created by operation of law at the time of severance" of two parcels that originally were in common ownership. *Hoyem Tr. v. Galt*, 1998 MT 300, ¶ 17, 292 Mont. 56, 968 P.2d 1135; *Wolf v. Owens*, 2007 MT 302, ¶¶ 16–17, 340 Mont. 74, 172 P.3d 124. There are two different types of implied easements: those by necessity and those by preexisting use. *Hoyem Tr.*, ¶ 17; *Wolf*, ¶¶ 16–17. "Easements by necessity are typically implied to provide access to a landlocked parcel, while easements by existing use are based on a landowner's prior use of part of his property (the quasi-servient tenement) for the benefit of another part of his property (the quasi-dominant tenement)." *Yellowstone River*, ¶ 30 (citation omitted); *Hoyem Tr.*, ¶¶ 18–19, 29; *Wolf*, ¶¶ 16–17. "Implied easements rest upon the intent of parties gathered from the evidence." *White v. Landerdahl*, 191 Mont. 554, 558, 625 P.2d 1145, 1147 (1981) (citation omitted).

¶28　To establish an implied easement by preexisting use, a party must show that: (1) the dominant and servient tenements are severed from a common ownership ("unity of ownership"); (2) the use of the servient tenement is apparent, continuous, and reasonably necessary for the beneficial use and enjoyment of the dominant tenement at the time of severance; and (3) the parties to the deed that severed the tenements intended the use to continue after the division. *Yellowstone River*, ¶ 30 (citing *Waters v. Blagg*, 2008 MT 451,

15

¶ 14, 348 Mont. 48, 202 P.3d 110 (*overruled on other grounds in Earl v. Pavex Corp.*, 2013 MT 343, ¶ 31, 372 Mont. 476, 313 P.3d 154)).

¶29    JRN argues that the District Court clearly erred when it determined that the DMLOA established by clear and convincing evidence all elements for an implied easement by preexisting use.    JRN contends that, pursuant to *Frame*, ¶¶ 16–18, the "common ownership" element for all implied easements—both those by necessity and those by preexisting use—requires that the dominant and servient tenements be contiguous. It argues that this requirement cannot be met under the circumstances because, as in *Frame*, "the State of Montana owns the banks and beds of the Dearborn River[,]" which separates JRN's property from the properties across the river that are claiming the implied easement.

¶30    Both easements by preexisting use and easements by necessity require unity of ownership at the time of severance. *Hoyem Tr.*, ¶¶ 18, 22. Unity of ownership arises from the fact that the dominant and servient parcels were owned by one person or entity immediately prior to their severance. *Frame*, ¶ 12; *Schmid v. McDowell*, 199 Mont. 233, 238, 649 P.2d 431, 433 (1982)); *Woods v. Houle*, 235 Mont. 158, 162, 766 P.2d 250, 253 (1988) (citation omitted).  "[A] way of necessity can only arise out of the land granted or reserved by the grantor and never out of the land of a third party or a stranger to the title." *Schmid*, 199 Mont. at 238, 649 P.2d at 433 (citing *Zimmerman v. Summers*, 330 A.2d 722, 730 (Md. Ct. Spec. App. 1975); *Robertson v. Robertson*, 197 S.E.2d 183, 187 (Va. 1973)); *see also Loomis v. Luraski*, 2001 MT 223, ¶ 31, 306 Mont. 478, 36 P.3d 862 (citations omitted) (noting that "an easement cannot be reserved in favor of a stranger to the deed" because the dominant estate would not have the opportunity to negotiate with the grantor,

the easement would not appear in the chain of title which would leave bona fide purchasers without notice, and such an easement may lead to unexpected taxes, environmental concerns, and potential litigation). JRN does not appear to dispute on appeal the District Court's finding that the Dearborn Meadows properties involved in this dispute were held by the same person or entity immediately prior to their severance.

¶31 Easements by necessity and preexisting use part company in their remaining elements. For easements by necessity, its single remaining element is that of "strict necessity," which "requires that there be no practical access to a public road from the landlocked parcel except across lands that were formerly in common ownership." *Yellowstone River*, ¶¶ 30, 46 (citation omitted). Strict necessity allows the required inference that the parties to the deed would not have intended to leave a parcel landlocked. *See Hoyem Tr.*, ¶ 19 (quoting *Graham v. Mack*, 216 Mont. 165, 175, 699 P.2d 590, 596 (1984)) (easements by necessity give effect to the "strong public policy against shutting off a tract of land and thus rendering it unusable [which] gives rise to a fictional intent defeating any such restraint" (internal quotation marks omitted)). Because easements by preexisting use allow intent to be inferred from the use itself, *see Waters*, ¶ 17; *Hoyem Tr.*, ¶ 29, this type of easement requires only that the easement be "reasonably necessary . . . for the beneficial use and enjoyment" of the dominant tenement. *Yellowstone River*, ¶ 30.

¶32 In *Schmid*, this Court considered whether an implied easement by necessity had been established for the benefit of one parcel over the other when both parcels "were landlocked with no access to a public road except across state or [third-party] lands."

17

*Schmid*, 199 Mont. at 236, 649 P.2d at 432. We concluded that an easement by necessity could not exist because neither the alleged dominant tenement nor the alleged servient tenement had access to a public road when the property was divided, a requirement to establish the "strict necessity" element for easements by necessity. *Schmid*, 199 Mont. at 238, 649 P.2d at 433 (citing *Griffin v. North*, 373 So. 2d 96, 97 (Fla. Dist. Ct. App. 1979); *Daywalt v. Walker*, 31 Cal. Rptr. 899, 903 (Cal. Ct. App. 1963)). Because the easement additionally would have to cross State land not held in common ownership at the time of severance to reach such a public road, there was no way for the claimants to establish an easement by necessity. *Schmid*, 199 Mont. at 236–38, 649 P.2d at 432–33 (citations omitted).

¶33 We relied on the concepts underlying *Schmid* in *Frame*. There, this Court considered whether an easement by necessity existed in the Dearborn River area. *Frame*, ¶¶ 1–2. The purported dominant tenement used a road on the purported servient tenement that led to the Dearborn River and always had been controlled by a gate. *Frame*, ¶ 4. Relying on *Schmid*'s conclusion that an easement by necessity could not exist where the easement would have to cross a third party's property to meet the strict necessity element, we concluded that "[t]he unity of ownership required to imply an easement by necessity cannot exist in this case . . . because the State-owned bed and banks of the Dearborn River separate the Poole/Huber land from the Frame land. . . . The River has always separated the tracts." *Frame*, ¶ 16. The Court thus specifically articulated the requirement for easements by necessity that the parcels held in common ownership be contiguous. *Frame*, ¶¶ 16–18. *See also Yellowstone River*, ¶ 35 (citing Thompson on Real

18

Property vol. 7, § 60.03(b)(5)(iii), 506 (2d Thomas ed., Matthew Bender 2006)) ("[a]n easement by necessity cannot be created unless the dominant and servient tenements were originally one piece of property").

¶34 Both *Schmid* and *Frame* involved claims to an implied easement by necessity. The rationale underlying those decisions was based in the "strict necessity" element for such easements. *See Schmid*, 199 Mont. at 238, 649 P.2d at 433 ("a way of necessity cannot exist across land which had no access to a public road when the property was divided by the common grantor"); *Frame*, ¶ 17 ("An easement by necessity can be implied, if at all, only to cross lands formerly held in unified ownership to reach a public road. An easement by necessity cannot be implied to merely reach the land of a third party which was not part of the original unified ownership."). We observed in *Schmid*, 199 Mont. at 237, 649 P.2d at 432–33, that "[a] way of necessity is distinguished from other implied easements" in that it need not be in existence or "open and visible" at the time of conveyance. *Schmid*'s holding regarding the contiguous nature of the parcels necessarily flowed from the lack of strict necessity and does not supply controlling authority for easements by preexisting use, which are in existence at the time of conveyance and do not share the strict necessity requirement.

¶35 The elements for implied easements by preexisting use do not require that the severed parcels be contiguous. Easements by necessity are available only to a dominant parcel that is truly landlocked, at least in part, by the servient parcel. This requirement recognizes that easements by necessity do not infer intent from a route previously in existence: the only reasonable way, then, to impose the required fictional intent of the

19

original parties is to ensure that the original parties' parcels were truly contiguous.

*See Hoyem Tr.*, ¶ 19 (quoting *Graham*, 216 Mont. at 175, 699 P.2d at 596).

> [I]f the alleged dominant and servient parcels were never held in common ownership, or *if the particular severance did not leave the dominant estate isolated*, then the inferred intent theory fails and the doctrine of easement by necessity simply has no application. But, if the alleged dominant and servient parcels were held in common ownership, and *if a severance of that unified property resulted in a landlocked parcel and a non-landlocked parcel*, then it is inferred that the common owner intended at the time of severance to grant or reserve an easement over the non-landlocked parcel for the benefit of the landlocked one.

*Yellowstone River*, ¶ 38 (emphasis added); *see also Frame*, ¶ 10 (citing *Big Sky Hidden Vill. Owners Ass'n v. Hidden Vill., Inc.*, 276 Mont. 268, 277, 915 P.2d 845, 850 (1996)) ("Easements by necessity arose from a public policy against isolating tracts of land and thereby minimizing their utility, . . . but they may arise only in the specific circumstances that come within the requirements of law. Implied easements by necessity have never been intended to provide access across the land of others to benefit any and all landlocked property.").

¶36 Easements by preexisting use, however, do not necessarily require the dominant parcel be "landlocked" because the parties' intent may be inferred directly from the prior use. *See, e.g., Waters*, ¶¶ 16–18 (recognizing that only easements by necessity require a direct connection to a public road over the land once held in common ownership because of the "critical distinction" between the two types of easements—that those based on preexisting use depend upon a route already in existence). *Waters* further clarified this distinction:

20

> The rationale behind this distinction is more practical th[a]n academic. Where a party seeks recognition of an implied easement by pre-existing use, the road in question is already being used for access to the outside world. Conversely, when an easement by necessity is being claimed where there is no connection to a public roadway, "the basic reason for the creation of a way of necessity, namely, to permit communication with the outside world, is not present." *Schmid v. McDowell*, 199 Mont. 233, 238, 649 P.2d 431, 433 (1982) (internal citations omitted). Such an easement would represent the proverbial "road to nowhere."

*Waters*, ¶ 17. The basis of the inferred intent for an easement by preexisting use—the prior use itself—is less attenuated than the basis of the inferred intent for an easement by necessity—the fact that the parcel is landlocked. Thus, though easements by necessity demand that the parcels be contiguous, easements by preexisting use do not demand such a requirement.[4]

¶37 The District Court thus did not clearly err in its determination that the DMLOA established the unity of ownership and reasonable necessity elements for an implied easement by preexisting use. Based on our disposition of this issue, we need not address JRN's related arguments regarding the District Court's denial of its summary judgment motion.

¶38 Finally, though JRN fails to clearly articulate its argument on appeal, it appears to claim that the DMLOA failed to establish the element of intent for an easement by

---

[4] Though we did not differentiate between the types of implied easements in *Davis v. Hall*, 2012 MT 125, ¶ 29, 365 Mont. 216, 280 P.3d 261, and *Meine v. Hren Ranches, Inc.*, 2015 MT 21, ¶ 27, 378 Mont. 100, 342 P.3d 22, when we stated that only implied easements garnered application of the somewhat related rule requiring "the dominant and servient estates . . . [to] physically abut in order to create an easement appurtenant[,]" these comments were in dicta as neither case dealt with implied easements. *Hall*, ¶¶ 1–2 (considering an express easement); *Meine*, ¶ 1 (considering a prescriptive easement). We thus do not find these comments controlling here.

21

preexisting use. Our review of the record supports the District Court's conclusion that the parties to the deed at the time of severance intended the Road be used to access the river for the purpose of reaching those parcels within Cascade County and Lewis and Clark County that could not otherwise be accessed: at the time of severance the Road was the only way to access the footbridge or ford that crosses the Dearborn River, which in turn is the only access to the properties on the west side of the river in Lewis & Clark County; and the original efforts to develop the properties across the river create an inference that the parties intended this use to continue.[5] *See Hoyem Tr.*, ¶ 23; *Wolf*, ¶ 21; *Waters*, ¶ 22; *Tungsten Holdings, Inc. v. Kimberlin*, 2000 MT 24, ¶ 27, 298 Mont. 176, 994 P.2d 1114 (a court may infer from the totality of the circumstances at the time of conveyance the parties' reasonable expectations); *see also Graham*, 216 Mont. at 174, 699 P.2d at 596 (a court may infer the parties' intent from use so long as obvious or from a manifestation that use should be permanent). We agree with JRN, however, that the DMLOA did not establish by clear and convincing evidence that the original parties that severed the property

---

[5] JRN also appears to contend that the District Court erred by denying its motion for summary judgment based on a lack of evidence regarding the elements of reasonable necessity and intent because:

> [w]hen JRN met its initial burden of showing there were no easements of record, other than the express utility easement in its deed, the burden shifted to the [DMLOA] to establish [the elements of intent and reasonable necessity] with substantial evidence, as opposed to mere denial, speculation, or conclusory statements[.]

Our review of the record supports the District Court's conclusion that there remained material facts in dispute regarding these elements. *See Westphal*, ¶ 12 (citing *Weber v. Interbel Tel. Coop., Inc.*, 2003 MT 320, ¶ 5, 318 Mont. 295, 80 P.3d 88) (a court must "draw all reasonable inferences against summary judgment").

intended all Dearborn Meadows residents—even those on the Cascade County side of the River with other means of access to their property—to be able to use the Road for recreational purposes. *See Waters*, ¶ 20 (citation omitted) ("The scope of an implied easement is controlled by the apparent intent of the landowner who effected a severance of the dominant and servient estates."). We therefore hold that the District Court did not err in its conclusion that an implied easement by preexisting use was established, but we conclude that this implied easement was established only for residential use of the properties in Lewis and Clark County and for the properties in Cascade County that have no other means of access to reach their land.

¶39    *C. Prescriptive Easement*

¶40    Similar to implied easements, prescriptive easements are created by operation of law. *Heller v. Gremaux*, 2002 MT 199, ¶ 12, 311 Mont. 178, 53 P.3d 1259 (citation omitted). To establish a prescriptive easement, a party must demonstrate its use of another's property is open and notorious, exclusive, adverse, and continuous and uninterrupted for the five-year statutory period. *Pedersen v. Ziehl*, 2013 MT 306, ¶ 13, 372 Mont. 223, 311 P.3d 765 (citing *Heller*, ¶ 12; § 70-19-404, MCA). If the claimant establishes the elements of a prescriptive easement, adverse use is presumed and the burden shifts to the owner of the servient estate to establish that the use was permissive. *Heller*, ¶ 15 (citation omitted); *State v. Cronin*, 179 Mont. 481, 488, 587 P.2d 395, 400 (1978).

¶41    Each element for an easement by prescriptive use must be established by clear and convincing evidence. *Heller*, ¶ 15 (citation omitted). "Open and notorious" means

23

"a distinct and positive assertion of a right hostile to the rights of the owner and brought to the attention of the owner." *Brumit v. Lewis*, 2002 MT 346, ¶¶ 15, 17–18, 313 Mont. 332, 61 P.3d 138 (use or maintenance that is not covert or hidden is enough to establish the element of open and notorious use). "[E]xclusive use means no more than that the right of the claimant must rest upon its own foundations and not depend upon a like right in any other person." *Lemont Land Corp. v. Rogers*, 269 Mont. 180, 185, 887 P.2d 724, 727 (1994) (citation omitted). "Adverse" use means "that the use is exercised under a claim of right and not as a mere privilege or license revocable at the pleasure of the owner of the land; such claim must be known to, and acquiesced in by, the owner of the land." *Rafanelli v. Dale*, 278 Mont. 28, 34, 924 P.2d 242, 246 (1996) (citation, internal quotation marks omitted). Adversity may be supported by evidence of use that disregards a gate or "no trespassing" sign, or by evidence of "[r]egular maintenance of a road by the party asserting a prescriptive easement[,]" though this evidence is not dispositive of the element. *See Rafanelli*, 278 Mont. at 35–37, 924 P.2d at 246–48 (citing *Swandal Ranch Co. v. Hunt*, 276 Mont. 229, 234, 915 P.2d 840, 844 (1996)). "Continuous and uninterrupted use" is regular use "made often enough to constitute notice of the claim to the potential servient owner"; it "does not mean constant use" but rather use "whenever . . . desired, without interference by the owner of the servient estate[.]" *Cook v. Hartman*, 2003 MT 251, ¶ 29, 317 Mont. 343, 77 P.3d 231 (citation omitted).

¶42   JRN argues that the District Court clearly erred when it concluded that the DMLOA had established by clear and convincing evidence all elements for a prescriptive easement. JRN argues that, because the properties' severance occurred in 1971 and there was a flood

24

in 1974 or 1975 that prevented use of the adjacent river ford until it was rebuilt in 1985, there was insufficient time for any DMLOA members to establish five years of prescriptive use before 1979—the date by which the District Court concluded the prescriptive easement had been established. JRN additionally argues generally that the evidence and testimony at trial was insufficient to provide a factual basis to find all necessary elements of a prescriptive easement for the requisite five years.[6]

¶43 The District Court concluded that the DMLOA had established, "certainly by 1979," a prescriptive easement. The District Court made several findings of fact, including that: (1) the Road has existed for decades, appearing on a 1961 USGS map and aerial photographs, visible on the ground on both sides of the river, designated with a sign, and connecting to the main road in the area; (2) DMLOA members for decades have used the Road without permission to access their properties and to access the river for recreation within the river high-water marks; (3) the ford connected to the Road is the only way to access the properties across the river—including property of at least thirty-six lot owners— and, though the location of the ford has changed, the location of the Road has not changed; (4) JRN was aware people traveled on the Road through its property when it purchased the

---

[6] JRN also contends that, because § 70-17-109, MCA, allows only an owner of a dominant estate to maintain an action for the enforcement of an easement—and the DMLOA did not own property in Dearborn Meadows until 1981—the DMLOA could not have established five years of prescriptive use by the time such an action was rendered impossible by a 1985 legislative enactment preventing the establishment of a prescriptive easement through "(a) recreational use of surface waters, including: (i) the streambeds underlying them; (ii) the banks up to the ordinary high-water mark; or (iii) any portage over and around barriers; or (b) the entering or crossing of private property to reach surface waters." Section 23-2-322(2), MCA. This argument fails. As discussed above, § 70-17-109, MCA, does not prevent an organization from asserting an action under the doctrine of associational standing, and the DMLOA's claims are thus based on the landowners' use of the Road since the time of severance.

property; (5) the Road was never gated or blocked by any prior property owners until JRN installed the gate in 2012 and offered adjoining landowners a key "if they agreed to JRN's use conditions[,]" including "a provision allowing JRN (or a successor-in-interest) to withdraw use permission at any time, thus impeding access to the adjacent properties."[7]

¶44 Based on these findings, the District Court concluded that community use of the Road was open, notorious, apparent, and obvious. It concluded that the community use was extensive and continuous, dating back decades to access properties and the River for recreation. It concluded the community use was exclusive, requiring no landowner permission, and that this use was never blocked until JRN placed its gate in 2012 which, although it slowed use of the Road, has not prevented it. Finally, the court concluded the community's use is adverse because of the continued residential and recreational uses despite the gate and "no trespassing" signs.

¶45 The District Court's findings are well supported by the record. The DMLOA presented ten witnesses who testified that the Road dating back to 1971 has been used without impediment in an open, notorious, exclusive, adverse, and continuous manner to reach the River and the properties located across the River. We find unpersuasive JRN's argument that the flood in 1974 or 1975 necessarily must have stalled use of the Road; the record shows that, despite washout of the downstream ford, landowners continued to use the Road during this time as a means of accessing the River and would then move upstream on the Cascade County side of the River until they reached the upstream ford. As noted

---

[7] JRN's notice letter included in the record does not contain any such provision.

by the DMLOA: "[t]his case is about a road on JRN property that goes to a river, not a ford across the riverbed owned by the State of Montana." The record demonstrates that DMLOA members continued to use the Road to access the River, either for recreational purposes or in order to drive along the River's edge to reach the upstream ford.

¶46 The District Court thus did not clearly err in concluding that the DMLOA established by clear and convincing evidence a prescriptive easement over the Road for its members' residential and recreational use.

¶47 *2. Whether the District Court abused its discretion by granting the DMLOA attorney fees under § 27-8-313, MCA.*

¶48 "Montana generally follows the American Rule that a party may not recover attorney fees in a civil action absent a specific contractual or statutory provision." *Hughes*, ¶ 13 (citations omitted). When a party asserts the UDJA as the remedy in a case, however, we have recognized that the party may petition the court for attorney fees under § 27-8-313, MCA—that section provides that a court may grant "[f]urther relief based on a declaratory judgment . . . whenever necessary or proper." *See Hughes*, ¶ 13 (citing *Mungas v. Great Falls Clinic, LLP*, 2009 MT 426, ¶ 43, 354 Mont. 50, 221 P.3d 1230); *Renville v. Farmers Ins. Exch.*, 2004 MT 366, ¶¶ 27–28, 324 Mont. 509, 105 P.3d 280.

¶49 *A. Application of the UDJA*

¶50 JRN first asserts that the District Court erred by allowing the DMLOA to petition for attorney fees when the DMLOA did not assert in its Counterclaim that it sought relief under the UDJA. JRN contends that the DMLOA could not have made such a request in any event because it did not seek a declaration of its rights under a written instrument as

required by the UDJA, § 27-8-202, MCA. Citing *Hughes* and *Steiger v. Brown*, 2007 MT 29, 336 Mont. 29, 152 P.3d 705, JRN further contends that Montana law is in conflict whether the UDJA may be applied to cases involving easement disputes. It argues that the circumstances here warrant application of *Steiger*, in which we held that the UDJA could not appropriately be applied in a case involving a prescriptive easement because such a case does not involve the rights of the parties under a written document.

¶51 The District Court concluded that, "[a]lthough Defendants do not expressly raise the Uniform Declaratory Judgment[s] Act in their counterclaim, Defendants cite the statute for awarding attorney's fees in their proposed findings of fact and conclusions of law." It further noted that "JRN framed this case as one for declaratory judgment and the parties seek corresponding relief on the same legal issue, *to wit*, whether a Powerline Road easement exists on the JRN property."

¶52 We have held that the UDJA "merely supplement[s] other claims and remedies independently available at law or in equity[,]" including injunctive relief "where 'necessary or proper' to effect or enforce a declaratory judgment." *Westphal*, ¶ 20 (citing M. R. Civ. P. 57; 26 C.J.S. *Declaratory Judgments* §§ 1–2 (2011)). There is thus no obvious problem with applying it in cases of real property disputes. And indeed, the UDJA previously has been applied to real property disputes, even where a written document was not interpreted. *See, e.g., Wolf*, ¶ 9; *Hughes*, ¶ 9. In *Hughes*, we considered an appeal regarding attorney fees granted under the UDJA in an easement dispute—the only issue being whether the equities supported such a grant of fees. *See Hughes*, ¶¶ 9, 12. There, the plaintiff brought a claim for prescriptive easement under the UDJA, but the defendant

28

ultimately prevailed and the court granted her attorney fees pursuant to § 27-8-313, MCA. *Hughes*, ¶ 9. Plaintiff appealed the grant of attorney fees, arguing only that the equitable considerations did not merit the award. *Hughes*, ¶ 12.

¶53 In *Steiger*, the plaintiffs alleged encroachment and trespass based on the defendant's garage allegedly crossing their boundary line, and they requested a boundary line determination. *Steiger*, ¶ 9. The defendant in her amended answer characterized the plaintiffs' complaint as a petition for declaratory judgment—though plaintiffs had not made such a claim—and she asserted claims for adverse possession and prescriptive easement. *Steiger*, ¶ 9. The district court concluded, among other things, that the defendant had no right to erect a fence over its property, but it denied fees to the plaintiffs "because their suit was not truly a declaratory judgment action." *Steiger*, ¶¶ 12–13. Plaintiffs then filed a motion to amend the judgment, seeking to convert the judgment into one for declaratory judgment and thereby recover their attorney fees, which the district court also denied because the case did not involve the interpretation of a written instrument. *Steiger*, ¶ 15. This Court affirmed, holding that plaintiffs were not entitled to an amended judgment because the case

> involve[d] the determination of a boundary line, premised not upon the interpretation or construction of respective deeds but upon competing surveys. Since the controversy in this case did not involve the construction of a deed or another instrument, statute, ordinance, contract or franchise, it is not a declaratory judgment action

and thus there was no basis for the award. *Steiger*, ¶¶ 27–29 (citing § 27-8-202, MCA).

¶54 Unlike *Steiger*, where the plaintiff never asserted the UDJA and the claims asserted involved no interpretation of written documents, JRN here explicitly asserted the UDJA in

29

its complaint, requesting relief in the form of declaratory judgment "as an interested person under a deed to the above referenced real property" and framing the case as one involving the interpretation of a deed. The DMLOA's counterclaims thus directly flowed from and responded to JRN's claims. *See Trs. of Ind. Univ. v. Buxaum*, 2003 MT 97, ¶¶ 23–24, 315 Mont. 210, 69 P.3d 663 (Concluding that an award of attorney fees under the UDJA to defendant estate was appropriate despite the defendant's failure to explicitly reference § 27-8-313, MCA, where "the parties clearly litigated the underlying coverage dispute within the confines of the UDJA. In fact, they did so at the [plaintiff] University's behest."). The District Court thus properly concluded that under the circumstances declaratory judgment was an appropriate form of relief for the DMLOA's claims of implied and prescriptive easements.

¶55    *B. Consideration of the Equities*

¶56    JRN argues in the alternative that the District Court abused its discretion when it determined that the equities warranted an award of attorney fees in this case. It contends that the court should not have granted attorney fees because "JRN consistently sought a civil remedy to the issues and disputes, while the [DMLOA] and its members resorted to self help measures of destroying JRN's property." JRN argues that the history of violence in the Dearborn area compelled it to pursue this lawsuit, stating that it "rationally determined, in order to have a peaceful solution, judicial resolution was necessary so that JRN members and their heirs would not be intimidated or hurt while enjoying its property. Everyone in the community needed to know the rules so that they could all enjoy their own properties."

30

¶57    Before considering whether attorney fees are "necessary and proper" under UDJA's supplemental relief statute, a court first must determine whether such an award rests in equity. *Hughes*, ¶ 13 (citing *United Nat'l Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 2009 MT 269, ¶ 38, 352 Mont. 105, 214 P.3d 1260; *Mungas*, ¶ 45). Merely prevailing "in defending private property rights cannot qualify as a sufficiently compelling reason to justify an award of attorney fees under § 27-8-313, MCA." *Hughes*, ¶ 20 (citing *Mungas*, ¶ 44; *Martin v. SAIF Corp.*, 2007 MT 234, ¶¶ 25, 28, 339 Mont. 167, 167 P.3d 916). Instead, the equities will support such an award when it will prevent an "anomalous result," such as when a party "accrue[s] a significant amount of attorney fees in order to recover a comparatively small award of damages." *Hughes*, ¶ 15 (citing *Renville*, ¶¶ 18, 22; *United Nat'l Ins.*, ¶ 38) (explaining that the party seeking attorney fees "would have been better off had she never brought the claim in the first place without an award of fees to cover the cost of collecting the disputed damages"). "Equity generally does not support an award of attorney fees under the UDJA, however, if similarly situated parties genuinely dispute their rights." *Hughes*, ¶ 16 (citing *United Nat'l Ins.*, ¶ 39; *Mungas*, ¶ 46).

¶58    The District Court held that the equities supported an award of attorney fees to the DMLOA because the parties were in an unequal position in the litigation. It concluded that the lawsuit was "initiated by JRN against a voluntary association with very limited resources and for the purpose of JRN seeking a judicial stamp of approval for its unilateral decision to put a gate on a community road simply because it dislikes the public accessing the Dearborn River near its land." The District Court reasoned that the DMLOA is similar to the defendants in *City of Helena v. Svee*, 2014 MT 311, 377 Mont 158, 339 P.3d 32, and

31

*Buxaum*, who "were successful at trial and had very limited resources to defend the suits brought against them by more financially capable, sophisticated plaintiffs." The District Court found that the DMLOA is a voluntary association that is "always cash strapped," relying on voluntary payment of dues that it has no meaningful way to enforce; "[i]t is burdened with maintaining hundreds of miles of roads" and must ask volunteers to maintain its two community parks; and it has had to rely on fundraising efforts to defend its suit and pursue its counterclaims. The District Court thus concluded:

> Without an award of attorney fees, the DMLOA and the individual defendants stand to be in a worse position than if they had never responded to the Complaint. They will have secured an important easement ruling for the benefit of all land owners in the Dearborn Meadows area but will have lost the ability to maintain the roads and might have to sell of [sic] one of the community parks to pay for attorney fees if fundraising falls short.

The District Court then compared JRN's position:

> the principal members of JRN Holdings are Seattle-based professionals who own several vacation properties along the Dearborn River. They determined they had ample personal resources to commence and prosecute this litigation. They did not need a yearlong delay in trial date to fundraise money for their attorneys to proceed. The Court does not know their precise wealth, but the Court knows the relative positions of JRN Holdings and the Defendants are worlds apart in terms of wealth and means to pursue this litigation.

¶59    In *Svee*, the city filed criminal and civil suits against the Svees alleging several code violations for their low-cost repairs of their roof to comply with their insurance policy. *Svee*, ¶¶ 2–4. The Svees ultimately prevailed in the civil suit, but the district court denied their request for attorney fees. *Svee*, ¶ 6. We reversed the denial of attorney fees, in part based on our conclusion that the parties were "clearly not similarly situated or on equal footing":

32

> The Svees sought to accomplish a low-cost repair of their roof in response to a notice from their insurance company about cancellation of their coverage. By so doing, they were named as defendants in both criminal and civil actions filed by the municipal government, in comparison to whom they had significantly less resources to litigate the alleged violation of the ordinance.

*Svee*, ¶ 21. In contrast, in *Hughes*, ¶ 19, we concluded that the parties were similarly situated as they had both "operated neighboring ranches for at least fifty years" and "dealt with each other over the years, more amicably at times, on relatively equal footing." We found nothing in the record to "indicate[] that Hughes acted in bad faith in bringing the declaratory judgment action": Hughes reasonably believed that he had a legal right to use the disputed roadway because he had used it without challenge for decades. *Hughes*, ¶ 20.

¶60 The record does not support the District Court's conclusion that the parties were on unequal footing. The DMLOA presented insufficient evidence to establish that JRN has significantly greater resources to pursue litigation—its evidence showed only that John Sechena and Ruth Sechena are both "successful private physicians who work[ed] and reside in Seattle, Washington. They also own and operate a vacation lodge on the Dearborn Meadows' property that charges $275/night, with a four-night minimum." Especially considering that there are several hundred members of the DMLOA who would stand to benefit from this action, this is insufficient information to lead to any inference about the parties' relative abilities to financially support a lawsuit.

¶61 The record also does not support the District Court's apparent conclusion that JRN acted in bad faith. It is evident in the record that JRN pursued this lawsuit with the intention of lawfully and peacefully resolving the parties' dispute. Indeed, the District Court specifically noted in its judgment the contention and violence that often accompanies the

33

protection of property rights in Montana, and JRN's course of conduct reflects its attempt to avoid such a circumstance. JRN provided notice of the gate to all landowners involved and followed through with its plan to erect and lock the gate in incremental steps to avoid any "violence" or "intimidation." Neither any landowners nor the DMLOA objected to JRN's gate at the time it was erected, only pursuing their concerns several years later. And JRN's suit followed only when the gate was destroyed several times and the DMLOA threatened to remove it again at JRN's expense. Both parties had good faith and genuine beliefs supporting their claims, and the record does not support the DMLOA's contention that JRN "intend[ed] to exploit [the parties'] disparate financial situations." *See Ethen Revocable Tr. v. River Res. Outfitters, LLC*, 2011 MT 143, ¶ 57, 361 Mont. 57, 256 P.3d 913 (noting that the equities did not support an award of attorney fees where both parties genuinely believed they owned the disputed property). Instead, the record demonstrates that, right or wrong, JRN had a genuine belief that no easements existed across its property beyond the power company's easement and that by erecting the gate JRN was attempting to respond to the general public's use and vandalism of its property and the Road. *Hughes*, ¶ 20.

¶62 Although the DMLOA has incurred substantial legal fees drawing on its limited operating funds, the record shows that it reasonably believed it was in its members' best interests to pursue through its counterclaim a judicial determination affirming the rights of its members to use the Road in order to discourage other landowners from gating other roads in the Dearborn Meadows area. We thus conclude that the District Court abused its discretion when it determined that the equities support an award of attorney fees to the

34

DMLOA. We need not address JRN's additional arguments regarding the District Court's order for the DMLOA to file a petition for attorney fees, the timeliness of the DMLOA's motion, the District Court's application of the tangible parameters test, or the District Court's findings regarding the reasonableness of the fees awarded. *See Hughes*, ¶ 21 (citing *United Nat'l Ins.*, ¶ 38); *Mungas*, ¶ 46 (where this Court declined to apply the tangible parameters test due to the absence of equitable considerations to support the District Court's award of attorney fees).

## CONCLUSION

¶63 We affirm the District Court's declaration of an implied easement by preexisting use for residential use of the Dearborn Meadows properties that have no other means of access to reach their land. We reverse the District Court's determination that the implied easement extends to other DMLOA members, but we affirm its decision that all DMLOA members hold a prescriptive easement for both residential and recreational uses. We reverse the District Court's ruling that either an implied easement or a prescriptive easement exists for use by the public. We additionally reverse the District Court's award of attorney fees to the DMLOA.

¶64 The case is remanded for entry of judgment consistent with this Opinion.


/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR